IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>[1] SIMEON DE LA CRUZ PAREDES AKA "EL RUBIO",<br><br>Defendant. | CRIMINAL NO. 07-521 (ADC)<br><br>SEALED |

**REPORT AND RECOMMENDATION**

On June 18, 2008, a grand jury returned a superseding indictment against [1] Simeón De la Cruz Paredes ("De la Cruz Paredes" or "defendant") and [2] Fani Leonardo Lirano De la Cruz charging them with knowingly, willingly and intentionally bringing or attempting to bring illegally to the United States, by the use of an unseaworthy and overcrowded yawl which placed in jeopardy the lives of the aliens, at least twenty-three aliens, knowing that said persons were aliens, in violation of Title 8, United States Code, Sections 1324(a)(1)(A)(i)&(v)(II) and Section 1324(a)(1)(B)(iv).

Pending before the court is a motion *in limine* filed by De la Cruz Paredes requesting the exclusion at trial during the government's case in chief of defendant's identification by various material witnesses, as well as the United States' opposition to said motion.  (Docket 63 and 69). An evidentiary hearing was held on October 17, 2008, during which only one witness testified: Special Agent Pedro Ruiz Martínez ("Ruiz") from the Bureau of Immigration and Customs Enforcement ("ICE").

According to Ruiz, on October 8, 2007, a makeshift wooden vessel, more commonly referred to as a yawl, attempted to enter the United States around the area of Manatí, Puerto Rico.  During

the following days, that is between October 9 and 11, 2007, Ruiz and other agents interviewed approximately nineteen individuals, all undocumented illegal aliens, that had been traveling in the yawl. Male and female detainees were placed in separate holding units.

Of those nineteen individuals, five indicated that they were able to identify the captains of the yawl: Magdaleno Rodríguez de la Cruz, Belkys Santos, Dulce María Rojas, Francis Sánchez, and Fernando Díaz.[1] Fernando Díaz described "El Rubio" as dark skinned ("trigueño"), tall, thin, with a mustache and an age of approximately thirty-five years. Although nobody else gave a physical description of "El Rubio", Belkys Santos said that she knew "El Rubio" from her neighborhood, while Magdaleno Rodríguez de la Cruz said that he knew the captain of the yawl because he had dealt with the subject in making arrangements for the trip that according to them departed from the Boba River in the Nagua region of the Dominican Republic.

ICE and/or U.S. Border Patrol agents proceeded to request from Dominican Republic authorities information about the defendant, who at the time was not among the nineteen detained aliens that had been interviewed. As a result of said request, the agents obtained defendant's "cédula", that is an official document from the Dominican Republic that provides defendant's name, birth date, and municipality, among other information. (Exhibit 1.) The color photograph of the "cédula" shows De la Cruz Paredes with a bluish patterned background. Therefore, Ruiz requested an ICE technician to substitute a white, solid background for the patterned background in defendant's cédula picture for use in a photographic array.

A photographic array was subsequently prepared with eight photographs, defendant being placed right above number three. (Exhibit 2). At that point, various individuals among the nineteen

---

[1] Of these, only four were willing to cooperate with government authorities.

that were detained were presented individually the photo array which included defendant's photograph. Each one of the individuals was asked whether they recognized anybody from the photo array. Magdaleno Rodríguez de la Cruz and Belkys Santos positively identified De La Cruz Paredes as the captain of the yawl known as "El Rubio". Francis Sánchez and Fernando Díaz, however, did not identify the defendant as the captain of the yawl.

Defendant has raised several issues demanding suppression of his pre-trial identification. First, defendant claims that his photograph stands out from the others in the photographic array because it does not have any background. This argument is unpersuasive. Had the agents used the photograph as it appeared in defendant's cédula, defendant's photograph would have been the only one in the array with a pattern in the background. (Compare Exhibit 1 and Exhibit 2). On the other hand, using a white background (or what defendant characterizes in his motion *in limine* as no background) is less prejudicial because other photographs in the array (e.g., 1, 2, 4, 5, 7, and 8) have light, solid backgrounds. Using defendant's logic, one could argue that the sixth photograph of the array (which is not the defendant's) truly draws particular attention because it is the only one with a yellow background. (Exhibit 2). Thus, if anything, a background with a strong color or with a pattern could have distinguished one alternative from the rest, but defendant's photograph in the array has neither.[2]

Defendant also argues that his photograph is the only one that depicts an individual with "a white blaze in the middle of his forehead" and recent sun exposure. Moreover, defendant brings to

---

[2]Although during the evidentiary hearing Ruiz indicated that ICE has a sizable database of photographs since the merger of U.S. Customs and the Immigration Naturalization Service in 2003, no evidence was presented indicating that an alternate photograph of the defendant was part of ICE's database in October of 2007, that is before his "cédula" picture was obtained during the investigation of this case.

3

the court's attention the fact that not everyone in the photographic array has a mustache. A review of the photographic array, however, does not reveal that it is impermissibly suggestive. All eight photographs depict males within a relatively similar age range. In terms of skin color, only two individuals appear to be significantly different, number one (darker skin color) and number five (lighter skin color). As to hair color, all the individuals in the photographic array have a dark tone with the exception of number five. In addition, all the photographs depict males with brown or relatively dark eyes. Regarding facial hair, at least five photographs, including the defendant's, show individuals with a mustache. (Exhibit 2 - photographs 3, 4, 5, 6, and 8).

Although obviously there are some differences between each one of the individuals depicted in the photographs of the array, such differences do not rise to the level of making the array unduly suggestive. See, e.g., U.S. v. Bautista, 23 F.3d 726, 731 (2nd Cir. 1994) (array not suggestive where defendant's photograph was somewhat brighter and slightly more close up than the rest); U.S. v. Kelly, 516 F.Supp. 493, 494-495 (D.C. Nev. 1981) (finding an array not suggestive when some photographs had men clean shaven and others sporting moustaches and holding that "mere variations in appearance among persons or photographs presented to a witness do not automatically invalidate a pretrial identification"); U.S. v. Blaisdell, 559 F.Supp.2d 128, 152 (D.N.H. 2008) (array not suggestive even though defendant was one of only two men with a shaved head).

The determination of whether the case presents a very substantial likelihood of irreparable identification requires a two-step test. "The first step is to decide whether there was an impermissibly suggestive procedure." U.S. v. Hernderson, 320 F.3d 92, 100 (1st Cir. 2003). If the procedure was not impermissibly suggestive, then there is no need to delve any further into the inquiry of whether there has been a very substantial likelihood of irreparable identification. If,

however, the procedure was impermissibly suggestive, then the Court must decide "whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive... [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." Neil v. Biggers, 409 U.S. 188, 199-200 (1972).

For the reasons previously discussed the undersigned finds that the photo array used in this case was not impermissibly suggestive. Therefore, there is no need to proceed with the second phase of the analysis, namely the reliability factors under Neil v. Biggers, supra.[3] Hence, defendant's motion *in limine* to suppress the pretrial identification made by various material witnesses should be denied.

Despite this conclusion, however, defendant correctly points out that "[t]he total absence of a prior physical description by the witnesses the government intends to use is particularly troublesome... It is further distressing to note that the only witness who actually provided a physical description of 'El Rubio' did not identify defendant when shown the same photo spread as the other

---

[3]Some of defendant's arguments go to the reliability factors. For instance, defendant claims that the "fact that the photographs were shown ... four days after what must have been an extremely stressful experience further counsel against the admission of ... [the] identification." (Docket 63 at 6). But see U.S. v. Smith, 134 F.3d 384 (10th Cir. 1998) (finding that photo array was not impermissibly suggestive in a case where pretrial identification occurred eleven days after original description given) (unpublished). Defendant has also argued that material witness number one first identified another person as the captain of the vessel. (Docket 63 at 3). Ruiz, however, testified that the number eight that appears in Magdaleno Rodríguez de la Cruz's form was Ruiz's own mistake because he wrote the number of photographs in the array, rather than the number that Magdaleno Rodríguez de la Cruz had told him, that is, number three, corresponding to defendant's photograph. Ruiz testified that he asked again Magdaleno Rodríguez de la Cruz which was his choice, to which he replied once again number three. Hence, Ruiz proceeded to make the correction on the sheet. These issues, however, belong to the second phase of the test, that is the reliability factors. Since the undersigned has already concluded that the photo array was not impermissibly suggestive, there is no need to entertain these arguments on their merit.

two witnesses." (Docket 63 at 5). In this case, Ruiz testified that Fernando Díaz provided a prior physical description of "El Rubio", but when shown the photo array, Mr. Díaz did not identify the defendant as the captain of the yawl. On the other hand, Ruiz also testified that as to Magdaleno Rodríguez de la Cruz and Belkys Santos, who positively identified the defendant in the photo array, neither of them provided a physical description of "El Rubio" before the identification was made. Thus, this is a case in which those who did not describe the captain were able to identify him and those who described him failed to identify the captain.[4]

Although this is an awkward set of circumstances, the same do not necessarily mean that the procedure used and the photo array shown were impermissibly suggestive. See U.S. v. Roberson, 2008 WL 2323865 at 4 (W.D. Mo. 2008) (photographic array not impermissibly suggestive even though no description of defendant's features had been given); U.S. v. Peneaux, 538 F.Supp. 2d 1177, 1180 (D.S.D. 2008) (photo array not impermissibly suggestive even though no description of the alleged assailants had been obtained from the victim). The fact that law enforcement obtains a physical description from one source and shows a photo array to another individual that has not provided any physical description does not necessarily taint with suggestivity the photo array or identification procedure used. Furthermore, "[a] court must also be mindful that it is only in extraordinary cases that identification evidence should be withheld from the jury." U.S. v. Hernderson, 320 F.3d 92, 100 (1st Cir. 2003) (citations omitted). Nevertheless, the identification of

---

[4]This scenario is further complicated by two other aliens, among the nineteen that were detained, that were not shown the photo array. Wanda Sánchez said to the agents that she had paid money to a "hustler" named "El Rubio", but she was not shown any photographic array because she was repatriated due to the fact that she was a minor. Tony De la Cruz was also not shown the photo array. During the evidentiary hearing Ruiz did not give a clear answer as to why this was the case, but speculated that perhaps Tony De la Cruz had indicated that maybe he could identify the captain of the yawl. According to Ruiz, he only wanted to show the photo array those aliens that had stated unambiguously that they could identify the vessel's captain.

6

the defendant by those who never described him and the non identification by those who did constitutes fertile ground for a vigorous cross examination at trial.

WHEREFORE, since the photo array used was not impermissibly suggestive, it is recommended that defendant's motion *in limine* to suppress the pretrial identification (Docket 63) be DENIED.

IT IS SO RECOMMENDED.

The parties have two (2) days to file any objections to this report and recommendation. Failure to file same within the specified time waives the right to appeal this order. Henley Drilling Co. v. McGee, 36 F.3d 143, 150-151 (1st Cir. 1994); United States v. Valencia, 792 F.2d 4 (1st Cir. 1986).

In San Juan, Puerto Rico, this 20th day of October of 2008.

                                                    s/Marcos E. López  
                                                    U.S. MAGISTRATE JUDGE